Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| C.B. and A.B., <br><br> Plaintiffs, <br><br> vs. <br><br> OPTUM, UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, and THE DANAHER CORPORATION & SUBSIDIARIES MEDICAL PLAN, <br><br> Defendants. | COMPLAINT <br><br> Case No: |

Plaintiffs C. B. and A.B., through their undersigned counsel, complain and allege against Defendants Optum, United Healthcare Insurance Company ("UHC"), United Behavioral Health ("UBH") (collectively "United"), and The Danaher Corporation & Subsidiaries Medical Plan ("the Plan"), as follows:

**PARTIES, JURISDICTION AND VENUE**

1. C.B. and A.B. are natural persons.

2. C.B. resides in Wisconsin.

3. A.B. resides in Missouri.

4. C.B. is employed by Danaher, a global company with its headquarters in Washington D.C. Danaher provides benefits for its employees including, but not limited to, the healthcare benefits provided under the Plan.

5. C.B. was a participant in the Plan and A.B. was a beneficiary of the Plan at all relevant times.

6. The Plan is a self-funded employee welfare benefit plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

7. Optum, UHC, and UBH are United Healthcare affiliated companies doing business across the United States and in the State of Utah. Optum and UBH are the claims administrators for mental health claims under the Plan.

8. A.B. received medical treatment for his mental health conditions at ViewPoint Center ("ViewPoint") and Telos Residential Treatment Center ("Telos"). United initially denied payment for both facilities, partially reversed itself, and then failed to pay for the claims it had reversed.

9. A.B. was admitted to ViewPoint from June 16, 2017, to August 8, 2017, and then received treatment at Telos from August 8, 2017, through May 14, 2018.

10. This Court has jurisdiction in this matter under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

11. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) because United has significant claims processing and appeals operations, including relating to the claims in this case, in Salt Lake County, Utah, and the treatment at issue in this case was provided in Utah. In addition, C.B. and A.B. wish to preserve their family's anonymity given the sensitive nature of the medical care provided to A.B., which is the subject matter of this action. The Plaintiffs' wish to bring this case in Utah, as opposed to their state of residence, will maximize the chance of maintaining anonymity. Based on ERISA's nationwide service of process provision and 28 U.S.C. §1391, venue is appropriate in the State of Utah.

12. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah.

13. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

**A.B.'s Background and Treatment**

14. A.B. began having problems in middle school when his family moved to California. He struggled to make new friends.

15. Within a year, A.B. suffered a concussion and began experiencing a variety of serious mental health conditions and symptoms including, but not limited to, depression and anxiety. A.B. became hypersensitive to light and noise, experienced vertigo, and had difficulty concentrating. He also began engaging in self-harm behaviors.

16. A.B. became short tempered, violent, and destructive. His self-harm intensified as he attempted to use self-injury (such as punching himself in the head) and pain as a means of controlling his suicidal thoughts. Between September of 2016, and June of 2017, A.B. attempted suicide on five separate occasions through various means such as overdosing on medications, attempted drowning, and drunkenly approaching a highway overpass with intent to jump off.

17. A.B. was hospitalized for suicidal ideation and behavior and was then admitted to Viewpoint, a short-term mental health facility in Utah providing assessment and development of treatment plans for struggling adolescents.

18. A.B. went from Viewpoint to Telos for longer term residential treatment based on the severity of his conditions and symptoms.

19. A.B. continued in treatment at Telos based on his ongoing struggles with self-regulation, depression, anxiety, continued self-harm, and resistance to treatment until he was discharged on May 14, 2018.

20. C.B. appealed the denial of payment, but United failed to process the appeals properly. C.B. initiated litigation and the parties agreed to a dismissal without prejudice contingent on a remand back to the appeals stage.

**Claim History and Eventual Remand**

21. United's denial letter for ViewPoint, dated August 2, 2017, stated in pertinent part:

> Based on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care, it is my determination that no further authorization can be provided from 7/25/2017 and forward.
>
> Your child was admitted for the treatment of his depression. After talking with your child's doctor's designee, it is noted your child has made progress and that your child's condition no longer meets guidelines for further coverage of treatment in this setting. His suicidal thoughts have resolved. He is not homicidal or psychotic. He is taking medications and is able to participate in his treatment. He does not appear to require 24 hour nursing care and supervision for his remaining symptoms. He can continue his recovery in a less restrictive setting. Your child could continue care in the Mental Health Partial Hospitalization Program setting.

22. United's denial letter for Telos dated August 15, 2017, denied payment due to:

    > Benefit coverage of Residential Level of Care is not available on 08/08/2017 and forward. This is based on UBH Level of Care Guidelines for Residential Treatment of Mental Health Disorders and the UBH Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines. Your son needs help with his mood problems. He is not requiring 24 hour monitoring any longer after two months in treatment. He does need help with learning new coping skills. Care can continue in a Partial Hospital Program…

23. In a letter dated December 3, 2021, the law office of Brian King ("the Firm") submitted an appeal for the denial of payment for A.B.'s treatment at ViewPoint and Telos. The Firm alleged that A.B.'s treatment was medically necessary, that A.B. required 24-hour specialized treatment to adequately address his mental health issues, and that A.B. would not have received adequate treatment at a lower level of care.

24. The Firm wrote that even after A.B.'s admission to ViewPoint, he experienced suicidal thoughts which were "daily and chronic." The Firm argued that this, coupled with his history of suicide attempts and dangerous behaviors prior to his admission to ViewPoint clearly demonstrated that A.B. could not be effectively treated at a lower level of care.

25. The Firm included medical records which documented A.B.'s severe anxiety and panic attacks, mania, depression, thoughts of suicide, substance abuse cravings, aggression towards self and others, self-harming, and placement on safety status and suicide watch.

26. At times ViewPoint staff were so concerned regarding A.B.'s safety that they made A.B. sleep in the hallway so he could more easily be observed, made him count out loud in the bathroom, and had him shower in sight of staff with a bathing suit on. The Firm argued that A.B.'s medical records directly contradicted United's assertion that A.B. could have been treated in a lower level of care.

27. The Firm contended that A.B.'s treatment was offered in accordance with generally accepted standards of care and the terms of the insurance policy. The Firm wrote that residential treatment was a covered benefit and the insurance policy did not limit residential services to individuals with acute level needs or limit the amount of time that an individual could receive residential treatment.

28. The Firm argued that A.B.'s care was offered in accordance with the recommendation of his treatment team who were able to evaluate him and witness his progress on a firsthand basis.

29. The Firm included a psychological evaluation from Telos which showed that prior to his admission there "he had cuts from his shoulder to his wrist on both arms."

30. The Firm noted that A.B. engaged in behaviors like punching a wall while he was at Telos, and while he was largely able to get his self-harming under control while there, he still talked about suicide, and engaged in problematic behaviors such as throwing things, and stealing money.

31. The Firm stated that it had received guidelines from United, however it was unclear if these guidelines were the same guidelines United claimed to have used in its evaluation as the names were not consistent. If the guidelines were different, the Firm asked to be provided with a copy of the correct guidelines.

32. The Firm alleged that A.B. met the requirements listed in the guidelines in its possession to qualify for treatment at ViewPoint and Telos.

33. It stated that A.B. was eligible for benefits, residential treatment was covered by the Plan, A.B.'s treatment was provided by a capable team of licensed providers, A.B. could not have been safely treated at a lower level of care, and A.B.'s treatment was consistent with generally accepted standards of medical practice, credible research, the Optum guidelines, and was clinically appropriate.

34. The Firm took issue with some of United's requirements in these guidelines such as the mandate of a reasonable expectation of improvement within "a reasonable period of time." The Firm argued that United made no effort to define what it considered to be reasonable, and that timeframes for treatment were best established by the "well qualified clinicians who have had the benefits of examining, interviewing, and treating the patient on a day-to-day basis."

35. The Firm asked United to elaborate on how it determined what constituted a "reasonable" amount of time and whether it had predetermined timeframes in place when it approved or denied payment, or whether it evaluated what qualified as reasonable on a case-by-case basis.

36. The Firm wrote that A.B. continued to meet United's admission criteria, had set goals, was working towards discharge, was receiving the appropriate level of therapy in connection with clinical best practices, and had supportive family involvement.

37. The Firm further alleged that A.B. also met the requirements in United's residential treatment guidelines, as well as its common criteria for all levels of care. However, the Firm pointed out that United's guidelines were contradictory and at times impossible to satisfy.

38. For instance, United listed "[a]cute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered" as an example of a situation in which residential treatment would be necessary, while simultaneously requiring no "imminent or current risk of harm to self, others, and/or property."

39. The Firm alleged that United was forcing A.B. to exhibit acute level symptoms for his sub-acute residential treatment care to be approved.

40. The Firm contended that this constituted a violation of MHPAEA as United did not impose any similar requirements on sub-acute level medical or surgical care such as skilled nursing, inpatient rehabilitation, or hospice care.

41. The Firm wrote that A.B.'s treatment was provided in a way that directly addressed his underlying conditions and allowed him to finally be able to begin to control his behavioral issues and work through them.

42. The Firm reminded United that A.B. had incidents of self-harm and suicidal ideation even in the residential treatment environment and argued that he would not be able to be treated appropriately at a lower level of care.

43. In a letter dated February 15, 2022, United overturned the denial of payment for treatment at Viewpoint and approved dates of service from July 25, 2017, through August 8, 2017. The letter stated that the decision would be sent to the claims department for processing and to allow 30 days for this to occur, however United never actually paid for the portion of the claims it overturned.

44. In another letter, also dated February 15, 2022, United upheld the denial of payment for A.B.'s treatment at Telos. The reviewer offered the following justification for maintaining the denial:

> Based on the CASII Criteria, in my clinical judgement [sic] you did not meet the requirements to be treated at the Residential level of care at Telos Residential Treatment Center from 8/8/2017. Your records show that you were not experiencing serious risk of harm, you were functioning well in everyday activities, you were not exhibiting unstable cooccurring conditions, you had a supportive family and recovery environment, you did not require 24-hour supervision and your mood was stable. Based on the CASII rating you were able to continue work on your recovery with Partial Hospitalization providers. This would have allowed you to continue you [sic] care within your own community.

45. The letter also incorrectly stated that A.B.'s appeal rights had been exhausted.

46. On August 16, 2022, the Firm submitted a level two appeal of the denial of payment for A.B.'s treatment. The Firm noted that although United had ostensibly overturned the denial of payment for ViewPoint, it had yet to pay for the services and that this constituted a breach of the terms of the Plan.

47. The Firm pointed out that it was the recommendation of A.B.'s treatment team at ViewPoint that he be admitted to Telos to continue to treat his behaviors effectively and safely.

48. The Firm cited to an incident at the end of A.B.'s treatment at ViewPoint where he punched a wall and assaulted staff.

49. The Firm acknowledged that A.B.'s condition had improved somewhat due to his treatment at ViewPoint but argued that A.B. continued to experience violent outbursts and self-destructive behaviors while at Telos, and he even self-harmed by cutting while there and refused to commit to being safe.

50. In addition, the Firm cited to Telos medical records showing A.B.'s anxiety and depression, irritability, defiance, alcohol cravings, theft, inability to control his emotions, throwing objects, and physical assaults against other students.

51. The Firm contended that A.B. met the requirements listed in the CASII medical necessity guidelines utilized by United and pointed out that these same guidelines encouraged United's reviewers to err on the side of caution and stated that the highest applicable level of care should be selected if there was any doubt as to which treatment level was appropriate.

52. The Firm disputed some of United's findings in its denial letter. For instance, United stated that A.B. had a low risk of harm. But the Firm contended that A.B. met the criteria for a serious risk of harm due to actions like cutting himself while at Telos (including his admission that he was "trying for a vein"), physical altercations with others, and hitting walls.

53. The Firm also asserted that United's review scores were too low for the categories of functional impairment, co-occurring conditions, recovery environment, environmental support, resiliency and response to services, and involvement in services for both A.B. and his parents.

54. The Firm argued that United's analysis was superficial, did not mention events such as A.B.'s theft or unsafe behaviors, and instead gave brief one-sentence justifications to support the decisions with little to no reference to the medical records.

55. The Firm continued to allege that United's denial was a violation of MHPAEA, in this instance by requiring A.B. to satisfy requirements in multiple sets of criteria for his treatment to be approved, rather than utilizing one set like it would for analogous medical or surgical care.

56. In a letter dated September 16, 2022, United partially overturned the denial of payment for A.B.'s treatment at Telos. The letter stated in pertinent part:

> As requested, I as an [sic] UBH employee, have completed an appeal/grievance review on a request we received 08/17/2022. This review included an examination of the following information: Internal Case Records, Medical Records, Your Letter of Appeal and the American Association of Community Psychiatrists CALOCUS-CASII Child and Adolescent Level of Care/Service Intensity Utilization System (CALOCUS-CASII). After fully investigating the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode I have determined that benefit coverage is partially available for the following reason(s):
>
> You were admitted on 8/8/2017 and our coverage started on 8/29/2017. We have decided to cover your care from the beginning of your admission, from 8/8/2017 through to 9/15/2017. We recognize that you needed 24/7 observation for your safety beginning on 8/8/2017. Your doctor said, in the initial psychiatric evaluation dated 8/8/17, that you were admitted for an "evaluation of mood and behavior" and that you arrived after "a year and a half history of deteriorating behavior marked by depression, anxiety, suicidal thinking and deteriorating neurological function." Your doctor stated that when you were admitted, you showed some anxiety related to school and some worrying and a "self-esteem based kind of social anxiety." There was no evidence of OCD symptoms, no nervous tics or twitches. On your admission exam, you were noted to have no abnormal movements. Your energy level was normal with good eye contact, good speech and not distorted [sic] thoughts. You were goal directed and had no evidence of delusions or homicidal thinking. You admitted to occasional suicidal thoughts that were brief but that you were able to put them out of your mind. You said that you had no desire to act on them and no plan. Your thinking was generally intact. The doctor's recommendations were 1) continue medications unchanged while monitoring your mood 2) obtain information from a neurologist

11

to see if there was a seizure disorder, 3) to work on communication in the family, self-esteem and sickness mentality symptoms and 4) to be sure you had sufficient accommodations in school to help support you. There were no concerns for self-harm and no therapy arranged for this. On 9/1/2017 you had a treatment update. You were described as a fun kid to be around and getting along with "everyone on the floor." You admitted to staff that there was some cutting behavior, but you were honest about it even though you didn't say that you wanted to stop it. When staff looked at the cuts, they were described as "light" and no treatment was needed for them. The new treatment plan for September 2017 was to try to show you other positive things you could do instead of cutting, There was an incident on 9/13/2017 where while being bored you drew on your bicep in class. No medical treatment was needed for this. Because you were doing so well at this point, there [sic] we do not see that there was any further need for this level of care as of 9/15/2017.

Using the CALOCUS criteria, based on the symptoms reported by staff and after you had been at the program for about 5 or six [sic] weeks, you no longer met the criteria for 24/7 residential treatment but were stable for intensive outpatient treatment (IOP). IOP is between 9 and 19 hours a week of therapy. It appears that you were getting between 3 and 5 hours a week at this program, so that IOP a 2-4 [sic] fold increase in therapy to help you with your problems. This program would not have 24/7 supervision, but you had demonstrated a long time of safety and did not require this level of supervision.

The Guideline/Policy/Criteria used for the decision is: American Association of Community Psychiatrists CALOCUS-CASII Child and Adolescent Level of Care/Service Intensity Utilization System (CALOCUS-CASII), which is applicable for the mental health residential level of care.

57. United again failed to pay for the dates of service it claimed to have overturned.

### FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

58. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

59. United and the Plan failed to provide coverage for A.B.'s treatment in violation of the

express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

60. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

61. United failed to substantively respond to the issues presented in Plaintiffs' appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

62. United and the agents of the Plan breached their fiduciary duties to A.B. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.B.'s interest and for the exclusive purpose of providing benefits to him, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.B.'s claims.

63. In addition, United failed to abide by its own reviewers' findings that significant portions of the claims were in fact medically necessary and United would pay for these overturned dates of service.

64. The actions of United and the Plan in failing to provide coverage for A.B.'s medically necessary treatment violate the terms of the Plan and its medical necessity criteria.

65. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

66. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

67. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

68. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

69. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

70. The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the

medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

71. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for A.B.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

72. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

73. United and the Plan evaluated A.B.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

74. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that A.B. received. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in United's denial letters such as "You were goal directed and had no evidence of delusions or homicidal thinking."

75. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that A.B. received.

76. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

77. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

78. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice.

79. The Defendants must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

80. In addition, United's reviewers were not consistent with their own standards. United's final denial states both that, "There were no concerns for self-harm and no therapy arranged for this" and then only a few sentences later contradicts this and says that, "You admitted to staff that there was some cutting behavior, but you were honest about it even though you didn't say that you wanted to stop it."

81. The level of care applied by United failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or

relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

82. Although United gradually revised its adverse decisions and concluded that more and more dates of care were medically necessary, it never went into detail regarding how it determined that A.B. could now be safely treated at home.

83. In addition, United was not consistent with how it evaluated the claims and it utilized multiple sets of criteria and guidelines to inform its decision.

84. This constant shifting of requirements presents a metaphorical "moving target" and presented an additional hurdle A.B. was required to overcome for his treatment to be approved. On information and belief, United does not limit analogous medical or surgical care in this way.

85. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

86. United and the Plan did not address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

87. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendant from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiff for their loss arising out of the Defendant's violation of MHPAEA.

88. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for A.B.'s medically necessary treatment at ViewPoint and Telos under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 30th day of September, 2023.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiff

County of Plaintiffs' Residences:
Waukesha County, Wisconsin and Suffolk County, Massachusetts